UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

02-75120

| | |
|---|---|
| LIONEL Z. GLANCY, on behalf of himself and all others similarly situated, | Civ. Action No._____ |
| Plaintiff, | JOHN CORBETT O'MEARA |
| | **VERIFIED CLASS ACTION AND DERIVATIVE COMPLAINT** |
| vs. | |
| ROBERT S. TAUBMAN, WILLIAM S. TAUBMAN, LISA A. PAYNE, GRAHAM T. ALLISON, PETER KARMANOS, JR., ALLAN J. BLOOSTEIN, JEROME A. CHAZEN and S. PARKER GILBERT, | **MAGISTRATE JUDGE PEPE** |
| Defendants, | |
| -and- | |
| TAUBMAN CENTERS, INC., | |
| Nominal Defendant. | |



FILED
2002 DEC 24 A II: 47
U.S. DIST. COURT CLERK
EAST. DIST. MICHIGAN
DETROIT

Plaintiff, by his attorneys, for his complaint against defendants, allege upon personal knowledge with respect to himself, and upon information and belief based, inter alia, upon the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     Plaintiff brings this action as (a) a class action on behalf of himself and all other stockholders of Taubman Centers, Inc. ("Taubman Centers" or the "Company") who are similarly situated and (b) a derivative action on behalf of Taubman Centers, against the directors and/or senior officers and/or principal shareholders of Taubman Centers to enjoin certain actions of the Individual Defendants (as defined herein) which will, unless enjoined by the Court, thwart any unsolicited takeover, including a premium takeover offer for the Company by Simon Property Group, Inc. ("Simon Property"). Simon Property has offered to purchase the Company's shares for

a substantial premium over Taubman Centers' previously unaffected market price.

      1.     As described herein, the Individual Defendants have failed to adequately consider and/or pursue (including the possibility of negotiating for higher value) Simon Property's premium offer for Taubman Centers. Rather, the Individual Defendants are abusing their fiduciary positions of control over Taubman Centers to thwart any legitimate attempts or interest to acquire the Company for a substantial premium. Such conduct represents an effort by the Individual Defendants to entrench themselves in office so that they may continue to receive the substantial salaries, compensation and other benefits and perquisites of their corporate offices.

      2.     Specifically, the Taubman defendants have erected their purported veto power through a series of tactical corporate mechanisms giving them a blocking voting position against unsolicited takeovers. As detailed below, these include:

        a.     a provision in the Company's charter, extraordinary in that it is unalterable and unwaivable by the Company's board of directors, preventing any outside party from acquiring more than 8.2% of the Company's capital stock absent amendment of the charter by a two-thirds shareholder vote (the "Excess Share Provision");

        b.     providing to the Taubman defendants, for nominal consideration without shareholder approval, a new series of voting preferred stock (the "Series B Preferred Stock") that increased their purported voting power over the Company from less than 1% to just over 30%; and

        c.     most recently, and in direct response to Simon Property's offer, the acquisition of an additional 3% of voting power by exercising options and persuading several close associates of the family to sign over

2

voting rights on their shares, designed to ensure the Taubman's veto power over any sale (the "New 3% Shares").

3.      Whatever the motivation for and validity of any of these actions taken individually, taken together, their practical effect is to foreclose any offer that the Company's public shareholders may well consider to be in their economic interest to accept.

4.      The actions of the Individual Defendants constitute a breach of their fiduciary duties of loyalty and care in failing to respond reasonably and on an informed basis to bona fide offers to acquire the Company.

5.      In order to enable Taubman Centers' shareholders to at least be given a choice as to whether the accept the Simon Property offer, relief from this Court is necessary to invalidate and/or enjoin any vote by the Taubmans of their purported blocking position that would have the effect of disenfranchising the public shareholder body who own a majority of the economic interest in the Company.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1332, as plaintiff and defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.      Defendants are subject to personal jurisdiction in this judicial district, and transact business in this judicial district.

8.      The Court also has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(a)-(c), as a substantial part of the events and omissions giving rise to this action occurred in this

district.

## THE PARTIES

10.     Plaintiff Lionel Z. Glancy is, and during the times relevant has been, the owner of common stock of nominal defendant Taubman Centers.

11.     Nominal defendant Taubman Centers is a Michigan corporation with its principal executive offices located at 200 East Long Lake Road, Suite 300, Bloomfield Hills, Michigan. Taubman Centers owns, develops, acquires and operates regional shopping centers.

12.     Defendants Robert S. Taubman ("Robert Taubman"), William S. Taubman ("William Taubman"), Lisa A. Payne ("Lisa Payne"), Peter Karmanos Jr. ("Karmanos"), Graham T. Allison ("Allison"), S. Parker Gilbert ("Gilbert"), Allan J. Bloostein ("Bloostein") and Jerome A. Chazen ("Chazen") comprise the Board of Directors of Taubman Centers (collectively, the "Individual Defendants"). The Individual Defendants, if not members of the Taubman family, are selected by, dominated and controlled by the Taubmans. The Taubman Centers' Board is staggered and consists of three classes of directors elected tri-annually.

13.     Defendant Robert Taubman also serves as the Company's Chairman, President and Chief Executive Officer and the Chief Executive Officer and President of Taubman Realty Group Limited Partnership ("TRG"), the entity through which the Company conducts all of its operations.   In 2001, Robert Taubman earned $1,244,414 in total compensation from the Company.  In addition, he accrued $1,196,250 under the Company's Long-Term Performance Compensation Plan.  According to Company filings with the SEC, Robert Taubman owns and/or controls 158,500 shares of Taubman Centers common stock; 553,870 shares of Series B Preferred Stock; and 3,357,636 shares of common stock that Robert Taubman has the right to receive in exchange for TRG partnership units that he currently holds.

4

14.     Defendant William Taubman also serves as Executive Vice President of the Company and of TRG. William Taubman is the brother of Robert Taubman. In 2001, William Taubman earned $$812,629 in bonus and salary and accrued $453,750 under the Long-Term Performance Compensation Plan. According to Company filings with the SEC, William Taubman owns and/or controls 163,500 shares of Taubman Centers common stock (including 150,000 shares which were acquired through the exercise of options on November 14, 2002 at an exercise price per share of $9.69); 5,925 shares of Series B Preferred Stock; and 734,064 shares of common stock that William Taubman has the right to receive upon the exchange of TRG partnership units that he currently holds.

15.     Non-party A. Alfred Taubman ("Alfred Taubman"), who is the father of Robert and William Taubman, founded the Company in 1950 and served as its Chairman until his resignation in December 2001. As described herein, Alfred Taubman and his sons, William and Robert, control over 34% of the Company's voting power and have the power to dictate almost all of the Company's decisions. Alfred Taubman was also the former Chairman of Sotheby's Holdings Inc. In December 2001, he was convicted of conspiring with a rival auction house to fix commissions charged to sellers and is currently serving time in a federal prison facility. Upon his resignation from the Company's Board, in order to keep firm control of the Company in Taubman family hands during his incarceration, holders of the Company's Series B Preferred Stock waived the nine member Taubman Centers' Board requirement, thereby temporarily reducing the number of Company directors to eight. According to Company filings with the SEC, Alfred Taubman owns and/or controls 186,937 shares of Taubman Centers common stock; and 24,669,087 shares of Series B Preferred Stock.

5

16.     Defendant Lisa Payne also serves as Executive Vice President and Chief Financial and Administrative Officer of the Company.  According to Company filings with the SEC, Lisa Payne owns and/or controls 7,500 shares of Taubman Centers common stock and 600,828 shares of common stock that she will have the right to receive in exchange for TRG partnership units that she currently holds.

17.     Defendant Karmanos also serves with Alfred Taubman as a director of Detroit Renaissance, an urban renewal initiative.  Karmanos owns and/or controls 40,000 shares of Taubman Centers common stock.

18.     Defendants Allison, Bloostein, Chazen, and Gilbert have all been directors of Taubman Centers for more than the past three years and thus do not qualify as an "Independent Director" under §450.1107 of the Michigan Business Corporations Act.

19.     By virtue of their positions as directors and/or officers of Taubman Centers and their exercise of control over the business and corporate affairs of Taubman Centers, the Individual Defendants have, and at all relevant times had, the power to control and influence, and did control and influence and cause Taubman Centers to engage in the practices complained of herein.  Each Individual Defendant owed and owes Taubman Centers and its common stockholders fiduciary duties and were and are required to: (i) use their ability to control and manage Taubman Centers in a fair, just and equitable manner, (ii) act in furtherance of the best interests of Taubman Centers and its stockholders;  (iii) refrain from abusing their positions of control; and (iv) not favor their own interests at the expense of Taubman Centers and its stockholders.  By reason of their fiduciary relationships, these defendants owed and owe plaintiff and other members of the Class (as herein defined) the highest obligations of good faith, fair dealing, loyalty and due care.

20.     By virtue of the acts and conduct alleged herein, the Individual

Defendants, who control the actions of Taubman Centers, have breached and are breaching their

fiduciary duties to the common shareholders of Taubman Centers and to the Company itself.

21.     Each defendant herein is sued individually as a conspirator and/or aider

and abettor, or, as appropriate, in his capacity as a director of the Company, and the liability of

each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans,

schemes or transactions complained of herein.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings Counts I through IV of this action individually and as a

class action on behalf of all stockholders of Taubman Centers (excluding from the Class the

defendants herein and any person, firm, trust, corporation or other entity related to or affiliated

with any of the defendants) and their successors in interest, pursuant to Federal Rule of Civil

Procedure 23 ( the "Class").

23.     This action is properly maintainable as a class action.

24.     The Class is so numerous that joinder of all members is impracticable.  As

of March 25, 2002, there were approximately 51 million shares of Taubman Centers common

stock outstanding, excluding defendants and their affiliates.

25.     There are questions of law and fact which are common to the Class and

which predominate over questions affecting any individual class member.  The common

questions include, inter alia, the following:

(a)     whether defendants have breached their fiduciary and other

common law duties owed by them to plaintiff and the other members of the Class;

(b)     whether plaintiff and the other members of the Class are being and

7

will continue to be injured by the wrongful conduct alleged herein and, if so, what is the proper remedy; and

(c) whether the Series B Preferred Stock and the New 3% Shares have the right to vote and should be allowed to vote.

26. The claims of the plaintiff are typical of the claims of other members of the Class and plaintiff has the same interests as the other members of the Class. Plaintiff is an adequate representative of the Class and will fairly and adequately protect and assert the interests of the Class. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

27. Defendants have acted and are acting on grounds generally applicable to the Class, thereby making it appropriate to render final injunctive, or corresponding declaratory relief, with respect to the Class.

28. A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted, and no unusual difficulties are likely to be encountered in the management of this class action. Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually seek redress for the wrongful conduct alleged. Management of this action as a class action poses no manageability issues.

<u>SUBSTANTIVE ALLEGATIONS</u>

A. <u>Taubman Centers</u>

29. Taubman Centers is a Real Estate Investment Trust ("REIT") that owns, develops, acquires and operates regional shopping centers. The Company had its initial public offering in 1992. Upon completion of its IPO, Taubman Centers was installed as the managing

8

general partner of TRG. Taubman Centers currently owns a 62% partnership interest in TRG, through which it conducts all of its operations. Currently, Taubman Centers' real estate portfolio consists of approximately 20 urban and suburban shopping centers located in nine states.

**B.      The Taubmans Improperly Obtain Effective Veto Power Over
All of The Taubman Centers' Major Corporate Decisions**

30.     Taubman Centers' capital structure at the present time includes, inter alia, common stock and Series B Preferred Stock, which are the classes of shares outstanding. These classes of stock are sometimes collectively referred to as its "Capital Stock." The common stock and Series B Preferred Stock each entitle their holders to one vote per share on all matters, but otherwise differ substantially with respect to their preferences, entitlements and features. The Taubmans' holdings of Series B Preferred Stock (coupled with their common stock) purportedly provide them with approximately 34.6% of the voting power of the Company, or slightly in excess of one-third of the outstanding voting power. Holders of the Series B Preferred Stock also are entitled to designate at least four board members.

31.     The Taubman family obtained the aforementioned 34.6% voting power through a series of improper and self-serving transactions, as described below.

32.     In September of 1998, TRG exchanged its interests in 10 shopping centers for all of the partnership units owned by two pension trusts of General Motors Corporation ("GMPT") (the "GMPT Exchange"). This significant transaction had several important effects on the Company's corporate structure. Among others, under the terms of the GMPT Exchange, the Company became obligated to issue to certain non-controlling partners of TRG (which included the Taubmans), upon subscription, one share of Series B Preferred Stock for each of the TRG units held by such person. At the time of the GMPT Exchange, Alfred Taubman owned 18.2% of the TRG units while defendant Robert Taubman owned 2.3% of that entity's units,

9

among other principal holders. By virtue of the GMPT Exchange, the Taubmans as a group were able to accumulate their purported 34.6% voting position in the Capital Stock of Taubman Centers. In connection with that exchange, the Taubmans paid only approximately $38,000 for the Series B Preferred Stock.

33.     The receipt of Series B Preferred Stock by Taubman family members in connection with the GMPT Exchange in or about September 1998 was surreptitiously obtained without a necessary shareholder vote and is <u>ultra vires</u>. Specifically, the Series B Preferred Stock was purportedly authorized in Taubman Centers' Second Amended and Restated Articles of Incorporation, effective as of August 14, 1996. The Series B Preferred Stock was first specifically identified, however, in the Company's Restated Articles of Incorporation filed with the SEC on September 30, 1998 on Form 10Q. However, there was never a shareholder meeting to vote approval of an amendment to the Company's Articles of Incorporation for the issuance of the Series B Preferred Stock, whose rights entitlements and preferences were of an extraordinary nature and operated to revise the capital structure of the Company. The directors of Taubman Centers in 1998 could not arrogate to themselves the power to create and issue such shares without a prior two-thirds affirmative vote of the outstanding Taubman Centers shares at that time.

34.     In furtherance of the plan to give the Taubman family veto power over corporate governance, the Company amended and restated its Articles of Incorporation ("Articles of Incorporation") and By-Laws ("By-Laws") on August 11, 2000. The amendments provide that a vote of two-thirds (2/3) of the outstanding shares of Capital Stock is required to, <u>inter alia</u>: (a) remove any of Taubman Centers' directors for, or without, cause (<u>see</u> By-laws, Section 3.08); (b) amend the Company's Articles of Incorporation (<u>see</u> Articles of Incorporation, Section 2(b));

10

or (c) take any other shareholder action (including the approval of any merger) (see By-laws, Section 1.08; Articles of Incorporation, Section 3.08). Thus, by virtue of the Taubman's Capital Stock holdings, they have conferred upon themselves veto power over all of the aforementioned shareholder actions, e.g., the Company cannot obtain a 2/3 vote of the Capital Stock without the Taubman's consent on the matter.

35. Further cementing the Taubman's voting control over major corporate decisions, so long as the Series B Preferred Stock remains outstanding, Taubman Centers shall not, without the affirmative vote or consent of the holders of a majority of the outstanding shares of Series B Preferred Stock (voting as a separate class): (a) amend, alter or repeal the provisions of the Company's Articles of Incorporation; and (b) be a party to any material transaction, including without limitation, a merger, consolidation or share exchange (see Articles of Incorporation, Section II, (j)). Additionally, the holders of Series B Preferred Stock (as a separate class) are entitled to nominate up to four individuals for election as directors of the Company.

36. Notwithstanding that the Taubmans' acquisition of the Series B Preferred Stock should be deemed null and void and given no effect, the defendant directors, contrary to the governing corporate law and their fiduciary duties, deem and treat the Series B Preferred Stock as having been validly issued and include those shares in the Capital Structure for purposes of any vote. Thus, the Individual Defendants have conferred and/or purported to acquire veto power which is unlawful, preemptive and dilutive of the legitimate rights of the remaining shareholders.

37. The Series B Preferred Stock, however, which was issued in late 1998 to defendant Robert Taubman and his father, Alfred Taubman, was obtained by these individuals

11

without proper disclosure and without a necessary shareholder vote. The artifice and manipulation reflected in the issuance of the Series B Preferred Stock to the Taubmans in 1998 is highlighted by their reportedly having paid the Company only $38,000 for the stock.

38.     The Taubmans' veto power -- which is an even more entrenching anti-takeover defense than the well-known "poison pill" -- has the effect of making it extraordinarily difficult, expensive and/or impossible for any potential acquiror not approved by the Taubmans to acquire Taubman Centers. As a result, the veto power has the effect of precluding successful completion of even the most attractive offer for Taubman Centers unless the Taubmans acquiesce or approve.

39.     By virtue of this self-conferred veto power, the Taubmans caused a fundamental shift of power from Taubman Centers' common shareholders to themselves. The veto power thus permits the Individual Defendants, to act as the prime negotiators of -- and, in effect, totally to preclude -- any and all acquisition offers.

40.     This fundamental shift of control of the Company from its common shareholders to the Taubmans results in a heightened fiduciary duty on the part of the Taubmans, and the Board, which they control, to consider, in good faith, a third-party bid, and further requires the directors to pursue a third-party's bona fide interest in acquiring the Company and to negotiate in good faith with a bidder on behalf of the Company's shareholders.

41.     As explained herein, the Individual Defendants are using their veto power to the detriment of the Company's shareholders. Indeed, in light of Alfred Taubman's conviction and imprisonment, to comport with their fiduciary duties to the Company's shareholders, the Taubmans should have immediately relinquished their stranglehold over the Company's affairs.

12

**C.      Simon Property Makes A Premium Bid For
The Company That The Taubmans Summarily Reject**

42.      On October 16, 2002, David Simon, the CEO of Simon Property, a much larger, publicly traded REIT based in Indianapolis, called Robert Taubman to express Simon Property's interest in pursuing a business combination between Simon Property and the Company.  Later that day, Mr. Simon sent a letter to Robert Taubman containing a written proposal describing Simon Property's interest in a business combination with the Company.

43.      On October 21, 2002, Robert Taubman returned Mr. Simon's phone call and indicated that he had no interest in having any discussions or meetings regarding Simon Property's proposed business combination.

44.      On October 22, 2002, Simon Property sent a letter to Robert Taubman indicating his disappointment with the response to his earlier letter and setting forth an offer to purchase all of Taubman Centers' outstanding common stock for $17.50 per share in cash through a tender offer made directly to the Company's shareholders.  Simon Property also offered the opportunity to the Taubmans to remain limited partners in the Operating Partnership.

45.      On October 28, 2002, Robert Taubman sent a letter to Mr. Simon in response to Mr. Simon's letter of October 22, 2002, indicating that: "The Board is unanimous in concluding that the company has no interest whatsoever in pursuing a sale transaction, and that discussion as to such a transaction would not be productive."  Robert Taubman also orally expressed to Mr. Simon that he would resist any attempt by Simon Property to acquire Taubman Centers.

46.      On November 6, 2002, at the NAREIT national conference, Mr. Simon offered to provide Robert Taubman further details regarding Simon Property's offer to acquire the Company and reinforced Simon Property's willingness to accommodate the needs of the

13

Taubman family.  Robert Taubman refused to engage in any discussion about a possible sale of the Company to Simon Property.

47.  On November 13, 2002, David Simon sent a letter to the Taubman Centers Board complaining that defendant Robert Taubman had summarily rejected, without any consideration whatsoever, Simon Property's offer to purchase each of the shares of Taubman Centers for $17.50 in cash.  That offer, which was fully financed and was not subject to further due diligence, was 18% higher than the Company's unaffected closing stock price of $14.80 on November 12, 2002, and was higher than the price at which the common stock of Taubman Centers had ever traded.  The deal, which includes the assumption of debt, is valued at over $4 billion, at which approximately $1.7 billion would be for the outstanding stock.

48.  Mr. Simon's letter was made public by Simon Property in a press release issued over the PR NewsWire.  It is clear from that letter that the Taubmans, as well as the other Individual Defendants, have disregarded the interests of the Company's other shareholders and have flagrantly abused their control and veto power over key corporate decisions.

49.  The press release states as follows in relevant part:

Dear Members of the Board of Directors:

As you may know, we recently made a written offer to Robert S. Taubman to pay $17.50 in cash for each share of Taubman Centers, Inc. (the "Company") common stock.  Our all-cash offer would deliver to all Taubman shareholders a substantial premium -- approximately 18% above yesterday's closing price and 30% above the price on the day we initially made our offer -- and it exceeds the highest price at which Taubman shares have ever traded.  Our offer represents a compelling strategic and financial transaction that would produce substantial and immediate value for all of your shareholders.  We can move quickly since our offer is not subject to the receipt of financing or any due diligence investigation of the Company.

14

On several occasions, we have communicated our offer to Mr. Taubman and suggested that we have an opportunity to discuss it with the members of Taubman's board of directors. We wrote Mr. Taubman on October 16, 2002, to request a meeting to present our offer. He refused to meet. On October 22, 2002, we again wrote Mr. Taubman, this time setting forth the basic terms of our offer. Once again, he refused even to have a discussion, writing to us on October 28, 2002, that "the Company has no interest whatsoever in pursuing a sale
transaction . . ."

We are dismayed that Mr. Taubman continues in his refusal even to discuss our offer -- or indeed any sale transaction, particularly in light of the fact that we have expressed a willingness to be very flexible with respect to the structure of the proposed transaction. The offer is not conditioned upon any participation by the Taubman family. Instead we have agreed to accommodate any desire by the Taubman family to retain its economic interest in the Taubman Realty Group Limited Partnership, or, at their option, to participate in the transaction, and receive either cash or equivalent value for their existing partnership interests by exchanging them on a tax efficient basis for partnership interests in the Simon operating partnership.

Since the Taubman family can choose to (1) retain its current Taubman partnership units, (2) convert into Simon partnership units, or (3) sell for cash, we can only conclude that Mr. Taubman's refusal even to discuss our offer reflects the Taubman family's desire not to permit the Company to be sold under any circumstances. While it is entirely appropriate for the Taubman family to retain the right to choose between various options with respect to the treatment of its own partnership units, it is improper for these insiders to prevent public shareholders from choosing to receive a premium for their shares.

Mr. Taubman apparently believes the Taubman family is not accountable to the public shareholders because of the family's claimed blocking position -- via the Series B preferred stock -- which was surreptitiously issued in a "restructuring" transaction many years after the Company's initial public offering without either proper disclosure or a shareholder vote. We question both the propriety and validity of a transaction which attempts to transfer to the Taubman family control and a permanent veto over material decisions that rightfully belong to the public shareholders of Taubman – such as an all-cash, premium offer to acquire the Company.

15

The effect of the Series B preferred stock, for which the Taubman family paid a total of only $38,400.00, is to disenfranchise the public shareholders. This entrenchment device is a permanent corporate governance defect embedded in the Company's structure -- and it continues to hurt the public shareholders. Indeed, between the time the Series B shares were issued to the Taubman family in 1998 and our October 22 offer letter, the price of Taubman common shares has fallen by 4%.

We understand that the obstacles created in the governance structure by the Taubman family, at the expense of the public shareholders, are significant. However, with the cooperation of the Board of Directors, acting as fiduciaries for the common shareholders, we believe these obstacles are surmountable. We also trust that undisclosed economic or governance burdens have not been, and will not be, imposed on Taubman in response to our offer or otherwise.

We hope the Board will agree with us that our offer provides an excellent opportunity for Taubman shareholders to realize immediate liquidity and full value for their shares to an extent not likely to be available to them in the marketplace or in any alternative transaction. At a time when good corporate governance is particularly important to investors, we seek your help in restoring the rights of the public shareholders of Taubman.

We prefer to complete this acquisition through a negotiated transaction. We stand ready to make a detailed presentation of our offer to the Board and to answer any questions you may have.

50.    Simon Property's proposal and plea to the Company's Board fell on deaf ears. Within one hour of Simon Property's November 13, 2002 press release, the Company issued its own press release categorically rejecting the offer, stating that,"The Board unanimously concluded that Taubman Centers has no interest in pursuing a sale transaction and that discussions regarding such a transaction would not be productive." Defendants therefore took no steps to reasonably inform themselves about the Initial Offer or to engage in any attempts to increase the consideration offered. In no uncertain terms, the press release sends a

16

clear message to Simon Property and other potential bidders that the Taubman family is in charge and is only looking out for the Taubmans' interests.

**D.**          **The Voting Agreements, the New 3% Shares And The Staggered Board**

51.     In addition to stonewalling Simon Property in its attempts to discuss the Initial Offer, the Taubman family immediately began to further entrench itself in power over Taubman Centers by announcing various "private" transactions all designed to solidify power in the Taubman family. These transactions all violate the Michigan Control Share Act.

52.     On November 14, 2002, Robert and William Taubman exercised options that gave them 300,000 shares of Taubman Centers common stock.

53.     Robert Larson, a former Taubman Centers Vice Chairman and close friend of Alfred Taubman, purchased 266,366 shares of stock in the open market. Larson then transferred his voting interest over all of the shares he held to Robert Taubman.

54.     Max M. Fisher, a friend of Alfred Taubman, purchased through The Max M. Fisher Revocable Trust 150,000 shares of Taubman Centers and then transferred voting rights over all his shares to Robert Taubman. As a result of the transfer and other similar transactions, Robert Taubman has voting rights over an additional 2,440,762 TCI shares or approximately 3% of the outstanding Taubman Centers stock (the "New 3% Shares").

55.     No consideration was given by Robert Taubman for the voting agreements.

56.     Taubman Centers also maintains a staggered board which provides no opportunity to replace a majority of directors at any single annual meeting of shareholders. The Company's staggered Board further assures the Taubman family's control by eliminating any serious challenge to the Taubman family designees on the Board of Directors.

17

**E.**          <u>The Tender Offer and Special Meeting</u>

       57.     On December 5, 2002, Simon Property commenced a tender offer to acquire all of the outstanding shares of Taubman Centers at the increased price of $18.00 per share in cash. The tender offer is set to expire at 12:00 midnight on January 17, 2003. Success of the tender offer, however, is dependent on certain conditions, including amendment of the Company's Charter in certain respects and deactivation of certain barriers imposed by Michigan law.

       58.     On or about December 12, 2002, the Taubman Centers Board purportedly opted-out of the Michigan Control Share Act (Chapter 7B of the Michigan Business Corporation Act (M.B.C.A. §§ 450.1790 et seq.)).

       59.     On December 16, 2002, Simon Property filed preliminary proxy materials with the SEC with respect to the solicitation by Simon Property of appointments of designated agents (the "Simon Solicitation"). According to the Simon Solicitation, Simon Property is making the Simon Solicitation to call a special meeting of the shareholders for the Company, at which meeting Simon Property will ask the Company's shareholders to adopt a proposal to amend the Company's Restated Articles of Incorporation to provide that the purchase by Simon Property of all of the shares tendered pursuant to its offer would not trigger the Excess Share Provision (see below), and a proposal urging the Company Board to pass a resolution approving Simon Property's offer in order to satisfy the Business Combination Condition if the Company Board opts into the Michigan Business Combination Act. Originally, Simon Property had sought to invoke its right to cause a special meeting to be called under the Michigan Control Share Act to vote upon and approve its acquisition of control shares but its absolute right to do so was purportedly nullified by the Individual Defendants in opting-out of the Michigan Control Share

18

Act after Simon Property commenced its Tender Offer.

60.    On December 20, 2002, the Board of Directors, after meeting with their legal and financial advisors, determined to recommend that shareholders reject the Simon Solicitation and, if a special meeting were called, to vote against Simon Property's proposals. In addition, the Board also amended the Company's by-laws to make more restrictive the timing and procedures that would apply to a special meeting requested by the shareholders.

**F.      The Excess Share Provisions**

61.    Taubman Centers' Articles of Incorporation contain an "excess share provision" which prevents any outside shareholder from acquiring more than 8.23% of Taubman Centers' outstanding shares. This provision is ostensibly to ensure compliance with the so-called "50/50 rule" of the Internal Revenue Code, which prohibits five or fewer individuals from owning in the aggregate in excess of 50% of the value of the shares of a REIT during the last half of a REIT's taxable year. Any shares acquired by an individual shareholder in excess of the ownership limit become "excess shares" that are transferred to a trust for the benefit of a charity so that the purported acquiror obtains no voting rights or right to receive dividends on the shares. Typically, a REIT's board of directors is given the discretion to waive the excess share provision with respect to certain acquirors if the board is satisfied that the acquiror is not an individual for purposes of Section 542(a)(2) of the IRC. In the case of Taubman Centers, however, an amendment of the Company's Charter is required to waive the excess share provision. Such action requires approval by 2/3 of the Company's shareholders. Because of the Taubmans' veto power, they have the power to block such amendments and thereby prevent any hostile takeover.

61.    In addition, the Taubmans' receipt of their Series B Preferred Stock in 1998, representing greater than 8.23% of the outstanding equity, constituted the acquisition of

19

Excess Shares and, as such, these Excess Shares must be transferred to a trust for the benefit of a charity and stripped of any voting rights.

## COUNT I

### For Injunctive and Declaratory Relief –
### Invalid Issuance of Series B Preferred Stock

62.   Plaintiff repeats and realleges each allegation set forth herein.

63.   As described herein, the receipt of Series B Preferred Stock by Taubman family members in connection with the GMPT Exchange in or about September 1998 was surreptitiously obtained without a necessary shareholder vote and is ultra vires.

64.   In addition, the receipt of such shares constituted an improper issuance of Excess Shares in violating of the Company's Charter.

65.   Accordingly, plaintiff seeks (i) a declaration that the Taubman family's Series B Preferred Stock does not have any voting rights and/or should be donated to charity and (ii) injunctive relief prohibiting the Taubman family from voting the Series B Preferred Stock.

66.   Plaintiff has no adequate remedy at law.

## COUNT II

### For Injunctive and Declaratory Relief –
### Inproper Acquisition of the New 3% Shares

67.   Plaintiff repeats and realleges each allegation set forth herein.

68.   The Michigan Control Share Act, Chapter 7B of the Michigan Business Corporation Act (M.B.C.A. §§ 450.1790 et seq.), applies to the companies incorporated in the State of Michigan and applied to Taubman Centers at the times relevant to this Count.

69.   Pursuant to the Michigan Control Share Act, control shares are shares of a corporation that, when added to the pre-existing shares owned by a person or in respect to which

that person may exercise or direct the exercising of voting power, would entitle that person, immediately after the acquisition of the shares, directly or indirectly, alone or as part of a group, to exercise or direct the exercise o the voting power of the corporation within any of the following ranges:

     (a)    at least one-fifth, but less than one-third, of all voting power;

     (b)    at least one-third, but less than a majority, of all voting power; or

     (c)    a majority of all voting power.

70.    Pursuant to the Michigan Control Share Act, a control share acquisition is any direct or indirect acquisition of ownership of, or the power to direct the exercise of voting power with respect to, control shares.

71.    A person who acquires shares in a control share acquisition without the affirmative vote of a majority of the holders of all disinterested shares entitled to vote does not acquire the right to vote those control shares.

72.    On November 15, 2002, the Taubman family announced that certain non-family stockholders, including Robert Larson, Max Fisher and the Rakolta family (and entities they control), had given Robert Taubman irrevocable proxies to vote their shares.  In addition, the Taubman family announced that Robert Taubman and William Taubman had exercised a total of 300,000 options.  Thus, the Taubman family announced that it now controlled over one-third of the Company's outstanding voting stock.

73.    The power to vote the New 3% Shares increased the Taubman family's claimed voting power in the Company from 30% to 33.6%.  In other words, the Taubman family's voting power purportedly increased from (a) between one-fifth and one-third, to (b) between one-third and a majority, and constituted a control share acquisition pursuant to

M.B.C.A. §§ 450.1790(2)(b).

74.     The holders of the Company's disinterested voting stock have not voted to confer any voting rights with respect to the New 3% Shares.

75.     Accordingly, plaintiff seeks (i) a declaration that pursuant to the Michigan Control Share Act, the New 3% Shares do not have any voting rights, and (ii) injunctive relief prohibiting the Taubman family from voting the New 3% Shares.

76.     Plaintiff has no adequate remedy at law.

## COUNT III

### For Injunctive and Declaratory Relief - -
### Invalidity of Taubman Family Voting Control

77.     Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.  This claim arises under Michigan law and is against the Individual Defendants.

78.     The Series B Preferred Stock and the New 3% Shares do not have the right to vote and should not be allowed to vote because, *inter alia*:

(a)     the Board is following the dictates of the Taubman family without engaging in a searching, independent and deliberative consideration of the Simon Property offer, and passively accepting the Taubman family's position that it controls a blocking voting position when, in fact, that position was largely obtained without the required shareholder vote;

(b)     the Board has created, and continues to allow, an effective veto position for the Taubman family by giving them the Series B Preferred Stock for no fair consideration for the improper purpose of insulating the Company from third-party proposals such as the Simon Property offer;

(c)     the Board has failed to take the necessary steps to strip the excess shares

22

held by the Taubman family of their voting rights and transfer those shares to a charitable trust;

(d)     the Board is depriving the public stockholders of the opportunity to consider Simon Property's offer and effectively removing from the shareholders the choice of whether or not to tender their shares;

(e)     the Board is acquiescing in the Taubman family's arbitrary, irrational, and spiteful conduct towards the public shareholders and Simon Property, that is designed solely to entrench the Taubman family;

(f)     the Board is permitting the Series B Preferred Stock given to the Taubman family and the New 3% Shares to effectively prevent amendment of the charter to remove the Excess Share Provision, and failing to take steps to remove this impediment; and

(g)     the New 3% Shares have no voting rights under the Michigan Control Share Act.

79.     Plaintiff has been damaged, and continues to be damaged, as a direct result of defendants' conduct.

80.     Accordingly, plaintiff seeks a declaration that the Taubman family may not validly vote the Series B Preferred Stock and the New 3% Shares under circumstances that would have the effect of foreclosing the Simon Property tender offer and disenfranchising the public shareholder body, including at any special meeting and any vote to amend the charter's Excess Share Provision.

81.     Plaintiff has no adequate remedy at law.

23

## COUNT IV

### Class Claim For Breach of Fiduciary Duty

82.     Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.  This claim arises under Michigan law and is against the Individual Defendants.

83.     Defendants, acting in concert, have violated their fiduciary duties owed to the public shareholders of Taubman Centers and put their own personal interests ahead of the interests of the Taubman Centers public shareholders and are using their control positions as officers and directors of Taubman Centers for the purpose of retaining their positions and perquisites as Board members at the expense of Taubman Centers' public shareholders.

84.     The Individual Defendants are engaged in a course of conduct which evinces their failure to: (a) evaluate the benefits to the Company's shareholders of the Simon Property offer with requisite due care and diligence; (b) undertake an adequate evaluation of Taubman Centers' worth as a potential acquisition candidate; (c) take adequate steps to enhance Taubman Centers' value and/or attractiveness as an acquisition candidate; (d) effectively expose Taubman Centers to the marketplace in an effort to create an open auction for Taubman Centers; (e) adequately inform Taubman Centers shareholders concerning their recommendation against Simon Property's offer; or (f) act independently so that the interests of public shareholders would be protected.  Instead, defendants have sought to chill or block any potential offers for Taubman Centers.

85.     The Individual Defendants have improperly utilized the Company's defenses, including the Taubman's blocking position.  To act consistent with their fiduciary duties, the Individual Defendants should evaluate all available alternatives, including negotiating with Simon Property and any other potential suitors, which they have failed to do.

24

86.     The Individual Defendants are unlawfully manipulating the corporate machinery to avoid a timely and fair vote on their entrenching tactics and the Simon Property Offer. By precipitously opting-out of the provisions of the Michigan Control Act, the Individual Defendants have sought to deprive Simon Property of its ability to invoke a special meeting to address the validity of its acquisition of Control Shares and by subsequently passing a by-law to restrict shareholders' rights to call a special meeting, the Individual Defendants have further acted to change the rules in their favor after the takeover contest has begun. Such steps, if they are to be taken at all, should have been taken before there was any change to the status quo.

87.     The Individual Defendants owe fundamental fiduciary obligations under the present circumstances to take all necessary and appropriate steps to explore in good faith the Simon Property proposal and obtain all material information available. In addition, the Individual Defendants have the responsibility to act independently so that the interests of Taubman Centers' public stockholders will be protected, to seriously consider all bona fide offers for the Company, and to conduct fair and active bidding procedures or other mechanisms for checking the market to assure that the highest possible price is achieved. Further, the directors of the Company must adequately ensure that no conflict of interest exists between defendants' own interests and their fiduciary obligations to act in the shareholders' best interests or, if such conflicts exist, to ensure that they will be resolved in the best interests of the Company's public stockholders.

88.     Taubman Centers represents a highly attractive acquisition candidate. The Individual Defendants' conduct has deprived and will continue to deprive the Company's public shareholders of the very substantial premium which Simon Property (or any other bona fide bidder) is prepared to pay or of the enhanced premium which further exposure of the Company to

25

the market could provide. Defendants have denied shareholders their enjoyment of the full economic value of their investment by failing to evaluate Simon Property's good faith, premium offer. In addition, defendants' actions will likely deter any other potential bidders from coming forward so long as the Taubmans retain their choke-hold over the Company.

89. Taubman Centers' Board and its top management (including the Taubmans) have frustrated Simon Property's current acquisition proposal, even though such proposal would result in Taubman Centers' shareholders receiving a substantial premium for their shares. Indeed, the price of Taubman Centers' common stock has never traded above the $18.00 per share price offered by Simon Property. The Individual Defendants have engaged in these actions because they know that in the event Taubman Centers was acquired by any potential bidder, most or all of the directors of Taubman Centers and its senior management would, either in connection with the acquisition or shortly thereafter, be removed from the Board of the surviving company because their services would not be necessary. They would be mere surplusage, and thus an acquisition would bring an end to their power, prestige and profit. In so acting, Taubman Centers's directors and those in management allied with them have been aggrandizing their own personal positions and interests over those of Taubman Centers and its broader shareholder community to whom they owe fundamental fiduciary duties not to entrench themselves in office.

90. To the extent that the Individual Defendants are receiving any direction or guidance from Alfred Taubman, any such action by them would reflect unlawful and improper communications by Alfred Taubman which the Taubman family may not heed either as a manner of federal criminal law or state fiduciary law and principles.

91. By virtue of the acts and conduct alleged herein, the Individual

Defendants, who control the actions of the Company, have carried out a preconceived plan and scheme to place their own personal interests ahead of the interests of the shareholders of Taubman Centers and thereby entrench themselves in their offices and positions within the Company. The Individual Defendants have violated their fiduciary duties owed to plaintiff and the Class in that they have not and are not exercising independent business judgment and have acted and are acting to the detriment of the Company's public shareholders for their own personal benefit.

92.     Plaintiff seeks preliminary and permanent injunctive relief and declaratory relief preventing defendants from inequitably and unlawfully depriving plaintiff and the Class of their rights to realize a full and fair value for their stock at a substantial premium over the market price and to compel defendants to carry out their fiduciary duties of due care and loyalty.

93.     Only through the exercise of this Court's equitable powers can plaintiff be fully protected from the immediate and irreparable injury which the defendants' actions threaten to inflict.

94.     Unless enjoined by the Court, defendants will continue to breach their fiduciary duties owed to plaintiff and the members of the Class, and/or aid and abet and participate in such breaches of duty, will continue to entrench themselves in office, and will prevent the sale of Taubman Centers at a substantial premium, all to the irreparable harm of plaintiff and the other members of the Class.

95.     Plaintiff and the Class have no adequate remedy at law.

## COUNT V

### Derivative Claim For Breach of Fiduciary Duty

96.     Plaintiff repeats and realleges each of the foregoing allegations as if fully

27

set forth herein.

97.     Plaintiff brings this Count V derivatively in the right and for the benefit of Taubman Centers to redress injuries suffered and to be suffered by the Company as a direct result of the violations of fiduciary duties by the Individual Defendants.  In particular, plaintiff seeks redress in this Claim for the injuries suffered and to be suffered by the Company by virtue of, inter alia, the actions undertaken and measures approved by defendants which were and are motivated solely or primarily for purposes of entrenchment.

98.     Plaintiff has not made any demand on the present Board of Directors of Taubman Centers to institute this action because such demand would be futile and is thereby excused for the following reasons:

a       The Individual Defendants are not disinterested with respect to their approval and adoption of the Series B Preferred Shares and their summary, uninformed rejection of the recent premium offer, as these and other actions were undertaken unlawfully, in bad faith and with the primary purpose and effect of entrenchment.  The design and effect of these measures, and their timing, demonstrate that a basic motive of taking these actions and implementing these measures was to secure the Individual Defendants in their positions and emoluments within the Company and to cement the Taubmans' control.  Defendants' summary, uninformed rejection of the recent premium offer infringes on the voting rights of Taubman Centers' shareholders through manipulation of the corporate machinery and has clear anti-takeover purposes and consequences.  Under the circumstances, the Individual Defendants -- in approving and implementing these steps -- have acted with a sole or primary motive to perpetuate themselves in their positions of control within the corporate structure and to benefit themselves and other members of Taubman Centers executive management with whom they are

28

closely allied.

b.      The Individual Defendants are further interested in these transactions because each receives substantial salaries, bonuses, payments, benefits, and/or other emoluments by virtue of service on the Board. The Individual Defendants have thus benefitted and will continue to benefit from the wrongs herein alleged and have acted to preserve their positions of dominance and control and the perquisites thereof, and are incapable of exercising independent business judgment in deciding whether to bring this action. The Board members also have close personal and business ties with each other and are consequently interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves.

c.      In addition to being unlawful and abusive, the issuance of the Series B Preferred Shares, constituted waste which cannot be ratified.

99.      In addition to being self-interested, the Individual Defendants -- in taking the actions and approving the measures described above -- fundamentally failed to exercise sound and proper business judgment. Defendants, inter alia, have failed to exercise due care and to act in the best interests of the Company in formulating and approving transactions which are ultra vires, unlawful, unnecessary, wasteful and not in the best interests of the Company and its public shareholders. Ultra vires action cannot be ratified by board action.

100.      The principal wrongdoers and beneficiaries of the wrongdoing complained of herein -- including the Taubmans and other members of Taubman Centers' senior management -- are in a position to, and do, dominate and control the Taubman Centers Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action.

29

101.    As a result of the acts and conduct described above, the Individual Defendants are not fully informing themselves, are not acting in good faith and have deliberately and/or recklessly breached their fiduciary and other common law duties which they owe to the Company. Among other things, the unlawful and wasteful issuance of the Series B Preferred Shares and defendants' summary, uninformed rejection of the recent premium offers, have the effect of entrenching the Individual Defendants in their corporate offices against any real or perceived threat to their control and represents an ill-considered, hasty reaction which did not satisfy the directors' duty to obtain adequate information before rejecting a bona fide acquisition proposal. Defendants are manipulating Taubman Centers' corporate machinery and abusing their positions of control for purposes of securing their positions and control.

102.    To the extent that the conduct of the Individual Defendants is based upon what they perceive to be a threat by a third-party to take over Taubman Centers, the Individual Defendants have a heightened fiduciary duty to act in the best interest of the Company's public stockholders and to act reasonably with regard to any such perceived threat. They have recklessly and in bad faith violated such duties.

103.    By virtue of the acts and conduct alleged herein, the Individual Defendants are carrying out a preconceived plan and scheme to entrench themselves in office, to thwart a fair and open auction of the Company that would maximize shareholder value, and to protect and advance their own personal financial interests at the expense of Taubman Centers and its shareholders, acting grossly disproportionately to any real or apparent threat.

104.    By reason of the foregoing, Taubman Centers has sustained and will continue to sustain irreparable harm and has no adequate remedy at law.

30

## COUNT VI

### For Declaratory and Injunctive Relief

105.    Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

106.    The Court may grant the declaratory and injunctive relief sought herein pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 and 65.  A substantial controversy presently exists, as demonstrated by: (a) the Individual Defendants' rebuff of Simon Property's premium bids, (b) the Individual Defendants' unwillingness to meet with Simon Property to consider or discuss a combination or merger with Simon Property or any other possible acquiror; and (c) the Taubmans' improper acquisition and use of their Series B Preferred Shares as a blocking measure.  The public shareholders' interests in a potential sale of their Taubman Centers holdings is adverse to the interests of the Individual Defendants in their desire to retain their positions on the Taubman Centers Board.  The existence of this controversy is causing confusion and uncertainty in the market for public securities because investors do not know whether they will be able to avail themselves of an advantageous financial offer.  The granting of the requested declaratory and injunctive relief will serve the public interest by affording relief from such uncertainty and by avoiding delay.

107.    Moreover, such relief has become necessary not only because of the practical operation of the various procedural impediments created by the board and the Taubmans, but because the Company's board of directors is simply blindly following the dictates of the Taubman family and the stated or tacit wishes of Alfred Taubman.  Without first informing themselves and then engaging in a careful, independent and deliberate consideration of the Simon Property offer, the Board has merely accepted the Taubman family line that because

31

of the family's asserted veto power, there is nothing to talk about and any efforts to purchase the Company would not be "productive."

108.    Directors have a fiduciary duty not to allow the corporate machinery to be used in a manner injurious to the public shareholders, and controlling shareholders, such as the Taubmans, likewise have a duty to exercise their control in a fair and equitable manner. Having caused or allowed the Series B Preferred Stock to be given to the Taubman family while aware of the Excess Share Provision embedded in the Company's Charter, which, in conjunction with the New 3% Shares, operate to preclude Simon Property's all-cash offer, the Board must now act affirmatively to protect the Company's shareholders and not resign itself to domination and control by the Taubman family, whose interests directly contravene the best interests of the Company's shareholders.

WHEREFORE, plaintiff demands judgment as follows:

A       Declaring Count I through Count IV of this complaint to be proper class action claims and certifying plaintiff as class representative;

B.      Ordering the Individual Defendants to carry out their fiduciary duties to plaintiff, the Class and the Company by announcing their intention to:

(i)      cooperate fully with any entity or person, including Simon Property, having a bona fide interest in proposing any transaction which would maximize shareholder value, including, but not limited to, a buy-out or takeover of the Company;

(ii)     immediately undertake an appropriate evaluation of Taubman Centers' worth as a merger or acquisition candidate;

(iii)    take all appropriate steps to effectively expose Taubman Centers to the marketplace in an effort to create an active auction of the Company;

32

        (iv)    act independently so that the interests of the Company's public shareholders will be protected; and

        (v)    adequately ensure that no conflicts of interest exist between the Individual Defendants' own interest and their fiduciary obligation to maximize shareholder value or, in the event such conflicts exist, to ensure that all conflicts of interest are resolved in the best interests of the public shareholders of Taubman Centers.

        C.    Declaring that the Individual Defendants have violated their fiduciary duties to the Class and the Company;

        D.    Enjoining the Individual Defendants from abusing the corporate machinery of the Company for the purpose of entrenching themselves in office;

        E.    Declaring the Taubman's voting power in the Company illegal and ultra vires;

        F.    Ordering the Individual Defendants, jointly and severally, to account to plaintiff, the Class and the Company for all damages suffered and to be suffered by them as a result of the acts and transactions alleged herein;

        G.    Awarding plaintiff the costs and disbursements of this action, including a reasonable allowance for plaintiff's attorneys' and experts' fees; and

        H.    Granting such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

33

DATED: December 24, 2002

                                       **MILLER SHEA, P.C.**

                                       By: _____

                                            E. Powell Miller (P39487)
                                            Marc L. Newman (P51393)
1301 West Long Lake Road, Suite 135
Troy, MI 48098
Telephone: (248) 267-8200
Fax: (248) 267-8211

**FINK ZAUSMER & KAUFMAN, P.C.**
Mark J. Zausmer
Richard C. Kaufman
31700 Middlebelt Road, Suite 150
Farmington Hills, MI 48334
Telephone: 248-851-4111
Fax: 248-851-0100

**MILBERG WEISS BERSHAD
HYNES & LERACH LLP**
Melvyn I. Weiss
Steven G. Schulman
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Telephone: (212) 594-5300
Fax: (212) 868-1229

**WECHSLER HARWOOD LLP**
Robert I. Harwood
Matthew M. Houston
488 Madison Avenue
New York, NY 10022
Telephone: (212) 935-7400
Fax: (212) 753-3630

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Patricia C. Weiser
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
Telephone: (610) 667-7706
Fax: (610) 667-7056

34

WECHSLER    HARWOOD LLP                                          P.02/02

## VERIFICATION

STATE OF CALIFORNIA          )
                             )    ss.
COUNTY OF LOS ANGELES        )

      I, Lionel Z. Glancy, being duly sworn, depose and say:

      I have read the foregoing Complaint and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true. I am presently and was during the time that defendants continued to breach their fiduciary duties owed to the Company and its stockholders as set forth above, the owner of Taubman Centers, Inc. stock. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

                                       _____
                                       Lionel Z. Glancy

Sworn to before me this
20 day of December, 2002

_____
Notary Public

HILERIE E. SHER
Comm. # 1305180
NOTARY PUBLIC - CALIFORNIA
Los Angeles County
My Comm. Expires June 14, 2006